## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| R.J. ZAYED, In His Capacity | ) | CIVIL ACTION |
| As Court-Appointed Receiver | ) | |
| For The Oxford Global Partners, LLC, | ) | File No.: _____ |
| Universal Brokerage FX, and Other | ) | |
| Receiver Entities, | ) | |
| | ) | **COMPLAINT** |
| Plaintiff, | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Associated Bank, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

R.J. Zayed, in his capacity as Court-appointed Receiver (the "Receiver") for UBS Diversified Growth, LLC d/b/a UBS Diversified, Market Shot, LLC, Oxford Global Advisors, LLC, Oxford Global Partners, LLC, Oxford Global FX, LLC, Oxford FX Growth, L.P., and various other entities controlled by them (the "Receivership Entities") files this Complaint against Defendant Associated Bank, N.A. and alleges as follows:

### NATURE OF THE CASE

1.      This matter involves a prolific Ponzi scheme, which took an estimated $190 million from investors over the course of three years. The operators of the Ponzi scheme were Trevor Cook, Patrick Kiley, Chris Pettengill, Gerald Durand, and Jason Bo-Alan Beckman. Cook is currently serving a twenty-five year prison sentence for pleading guilty to his role in the massive fraud. (Ex. 1) Pettengill entered a plea agreement as to wire fraud, securities fraud and engaging in monetary transactions in property derived

1

from unlawful activity. After cooperating with the government, Pettengill was sentenced to a seven and a half year prison term on January 3, 2013. (Ex. 2) Beckman, Durand, and Kiley have been convicted by jury on numerous counts of fraud for their roles in the Ponzi scheme. Beckman and Durand were also sentenced on January 3, 2013. Beckman received a thirty-year prison sentence, Durand received a twenty-year prison sentence, and Kiley awaits sentencing.

2.      R.J. Zayed is the Court-appointed Receiver (hereafter, alternately referred to as "Receiver" or "Plaintiff") for Oxford Global Partners, LLC, Oxford Global FX, LLC, Oxford FX Growth, L.P., Universal Brokerage FX Management, LLC, Market Shot, LLC, and various other entities controlled by them (hereafter referred to collectively as "Receiver Estate", "Receiver Estates", or "Receivership Estate"). The Receiver brings this action against Associated Bank, NA (hereafter, alternately referred to as "Associated Bank", "the Bank", or "Defendant").

3.      The Ponzi scheme at issue in this Complaint concerned a purported currency-trading program (the "Currency Program") designed and promoted by Cook, Kiley and Shadi Swais of Crown Forex, SA, a Swiss Forex trader. The pitch was to have Cook and Kiley to use the Receiver Estates to promote investing with Crown Forex, SA which allegedly had the foreign currency trading expertise to generate a guaranteed return in excess of 10% per year with total liquidity 24 hours a day, seven days a week. In addition, investors were promised that their funds would be held in individual, segregated accounts. These promises were false.

2

4.      For the Currency Program to succeed, Cook, Kiley and Shadi Swais needed a cooperative bank, a bank that would allow sham accounts to be opened in the name of fictitious entities, create account documentation containing false information designed to avoid scrutiny, ignore federal money laundering regulations, ignore internal procedures, provide false and misleading information to investors and assist in the transfer of investor money to their own accounts, among other things. They turned to Associated Bank and with the Bank's substantial assistance, the Currency Program took in over $79 million in investor funds.

5.      For example, when Cook, Kiley and Shadi Swais first discussed the Currency Program with Associated Bank, Vice President Lien Sarles ("Sarles") was told that the plan was to have Crown Forex, SA open an account at Associated Bank to directly receive investor funds. Associated Bank advised that opening an account for the foreign domiciled Crown Forex, SA would create regulatory difficulties. Instead, Associated Bank recommended opening an account for a similarly named domestic LLC to receive investor funds, which would be subsequently transferred out of the United States to Crown Forex, SA. The account that was opened to accomplish this was the Crown Forex LLC account #1705. (Ex. 3, at 1763-1764—Deposition of Trevor Cook) As with the Currency Program, Crown Forex LLC and its Associated Bank account #1705 were a fraud.

6.      The Crown Forex LLC account #1705 was at all times a sham account opened to a fictitious entity. Crown Forex LLC was never registered with the State of

3

Minnesota or any other governmental authority.  Associated Bank knew this and still opened the account:

> 14.   I had previously opened accounts for Kiley and Cook and had been provided by them all necessary account opening documents and information. When I opened the Crown Forex LLC account, I was not provided with Secretary of State registration documentation.  I told Kiley that he must send the documentation to me after he completed a Secretary of State filing for Crown Forex LLC.  At the time I was opening the Crown Forex LLC account, I was aware that the account would hold client investment funds.

(Ex. 4—Affidavit of former Associated Bank Vice President Lien Sarles)



8.     Even warnings that the account would be closed or frozen for lack of proper documentation by the Bank's Monitoring Department were ignored by the Associated Bank employees working at the branch where millions had already been deposited into the Crown Forex LLC account #1705:

4

17.    I did not remember to follow-up with Kiley to obtain the missing Secretary of State registration documentation.  To the best of my knowledge, the Crown Forex LLC account remained open and active despite a lack of proof of Secretary of State registration.

18.    In the first quarter of 2009, I recall receiving emails from Associated Bank reminding me to obtain certain account opening materials related to customer accounts that I was opening.

19.    Around this time, one of the administrative assistants informed me that the monitoring department would be closing or freezing accounts after a forty-five day period if the proper account opening documentation was not provided.

(Ex. 4—Vice President Sarles Affidavit)





11.     Associated Bank also helped Cook obtain $600,000 in cash from the investor funds in the Crown Forex LLC account #1705 by transferring the necessary funds from account #1705 to Cook's own account at the Bank, making special

arrangements to have the cash on hand, and then allowing Cook to stuff the cash into a box and walk out the door under the pretext of buying a yacht. (Ex. 4, ¶¶ 23-24—Vice President Sarles Affidavit)





13.     Associated Bank knowingly aided and abetted one of the largest Ponzi schemes in Minnesota's history. As demonstrated above and in further detail below, at a minimum, Associated Bank engaged in and observed enough atypical banking activities and other circumstantial evidence to have actual knowledge of the fraud. Alternatively, Associated Bank was willfully indifferent to the fraud by ignoring the warnings raised about the Crown Forex LLC account #1705, Cook and Kiley's other suspicious activities, and by failing to investigate the suspicions thereby charging Associated Bank with knowledge of the fraud. Furthermore, the bank substantially assisted the fraud by opening the Crown Forex LLC account knowing its connection to Crown Forex, SA and the purpose of investor funds deposited therein, failing to conform with Bank and Bank

8

Secrecy Act/Anti-money-laundering ("BSA/AML") guidelines on business and personal accounts, despite serious red flags of fraud and insolvency, and through many other forms of assistance detailed above and below.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 754, 1692, 1367 and Federal Rule of Civil Procedure 4(k)(1)(C).

15.     Further, within ten days of his appointment, the Receiver filed the original Complaint and Order Appointing the Receiver in all United States District Courts pursuant to 28 U.S.C. §§ 754 and 1692, giving this Court *in rem* and *in personam* jurisdiction in each district where the Complaint and Order have been filed.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred, and the resulting damages were sustained, in Minnesota.

17.     Venue is also proper in the District of Minnesota because the Receiver was appointed in this District to marshal, preserve, account for, and liquidate the assets subject to the Receivership Orders and because the damages at issue in this action are Receivership Assets.

## THE PARTIES AND PONZI SCHEME PRINCIPALS

18.     Plaintiff was appointed as Receiver for the estates of, *inter alia*, Trevor G. Cook, Patrick J. Kiley and various other entities controlled by them ("Receivership Entities") by the United States District Court for the District of Minnesota, Chief Judge Michael J. Davis presiding, on November 23, 2009 in the cases of *SEC v. Cook et al.*, 09-cv-3333, and *CFTC v. Cook et al.*, 09-cv-3332, and on March 8, 2011 in the case of *SEC v. Beckman et al*., 11-cv-574. *Order Appointing Receiver*, No. 09-cv-3333, Doc. 13 (D. Minn. Nov. 23, 2009); Ex Parte *Statutory Restraining Order*, No. 09-cv-3332, Doc. 21 (D. Minn. Nov. 23, 2009); *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Doc. 68 (D. Minn. Dec. 11, 2009); *Order Continuing Appointment of the Temporary Receiver*, No. 09-cv-3332, Doc. 96 (D. Minn. Dec. 11, 2009); *Order Appointing Receiver*, No. 11-cv-574, Doc. 10 (D. Minn. Mar. 8, 2011).

19.     Pursuant to the Court's Receivership Orders, the Receiver stands in the place of the Receivership Entities and is authorized to pursue all suits which may be brought by the Receivership Entities. *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Doc. 68 at 3 (D. Minn. Dec. 11, 2009); *Order Continuing Appointment of the Temporary Receiver*, No. 09-cv-3332, Doc. 96, at 4 (D. Minn. Dec. 11, 2009); *Order Appointing Receiver*, No. 11-cv-574, Doc. 10, at 3 (D. Minn. Mar. 8, 2011). The Receivership Entities include "every other corporation, partnership, trust and/or entity (regardless of form) which is directly or indirectly owned by or under the direct or indirect control of Cook or Kiley, or any individual working in concert with any of the

10

Defendants . . . ." *Second Amended Order Appointing Receiver*, No. 09-cv-3333, Doc. 68, at 2 (D. Minn. Dec. 11, 2009); *SEC v. Cook*, Complaint, No. 09-cv-3333, Doc. 1, at 1; *see also* Ex Parte *Statutory Restraining Order*, No. 09-cv-3332, Doc. 21, at 7 (D. Minn. Nov. 23, 2009).

20.     The Receiver Entities include but are not limited to "Universal Brokerage FX Management, LLC;" "UBS Diversified;" "UBS Diversified, LLC;" "UBS Diversified Growth, LLC;" "UBS Global Advisors;" and "United Brokerage Services." These entities are hereafter referred to collectively as the "UBS Entities."[1]

21.     The Receiver Entities also include but are not limited to "Oxford Private Client Group;" "Oxford Global Advisors, LLC;" "Oxford Global Holdings;" "Oxford FX Advisors;" "Oxford FX Management, LLC;" "Oxford Institutional Growth LP;" "Oxford Global Partners, LLC;" "Oxford Global Partners;" "Oxford Capital Investments;" "Oxford Capital Holdings, LLC;" and "Oxford Global FX LLC." These entities are hereafter referred to collectively as the "Oxford Entities." (Christopher Pettengill Plea Agreement, ¶ 3(b)).

22.     The Ponzi scheme principals used the Oxford and UBS Entities to market and promote the scheme to investors. They used the entities to employ the pitchmen and telemarketers that prospected for potential investors and assisted Cook, Kiley, Beckman,

---

[1] Pettengill Plea Agreement at ¶ 3(a), available at http://www.justice.gov/usao/mn/downloads/Pettengill%20Plea%20Agreement%20Final%2006172011.pdf (last accessed January 10, 2013).  *See also, USA v. Pettengill*, No. 11-cr-192 (D. Minn.)

Durand and Pettengill (the "Ponzi scheme principals") in selling the Currency Program to the investors that attended seminars conducted by the Oxford and UBS Entities. They were also used as the fronts that provided investors with the instructions on how to transfer funds to the Crown Forex LLC account #1705 at Associated Bank. (Ex. 11) As a result of the fraud and other torts perpetrated through them by the Ponzi scheme principals, the Oxford and UBS Entities are considered to be victims and creditors of the Ponzi scheme. *Zayed v. Peregrine Fin. Group, Inc.*, No. 12-cv-269, 2012 U.S. Dist. LEXIS 86468, at *5 (D. Minn. June 22, 2012) ("Because this case involves a Ponzi scheme, the Receivership Entities are considered victims of the fraud and thus creditors of the Ponzi scheme.").

23.    Trevor G. Cook ("Cook") is serving a 25-year sentence after pleading guilty to crimes he committed in furtherance of an admitted fraudulent scheme. At various times relevant to this Complaint, Cook owned, operated, and was the managing partner of Oxford Global Advisors, LLC ("Oxford Global Advisors") and Oxford Global Partners, LLC ("Oxford Global Partners"). Cook held himself out publicly as the chief investment director of Oxford Global Partners. Cook also owned and operated Oxford Global FX and Market Shot and held himself out to be a partner and managing director of UBS Diversified Growth, LLC d/b/a UBS Diversified ("UBS Diversified").

24.    Patrick J. Kiley ("Kiley") has been convicted for his role in the Ponzi scheme. Kiley was the owner and founder of UBS Diversified and Universal Brokerage FX management, LLC ("Universal Brokerage"). At all times relevant to this Complaint,

Kiley hosted a financial-themed radio show that he used to market the Currency Program. Kiley has never been registered with the CFTC and has never been associated with any registered entity. Kiley awaits sentencing for his role in this Ponzi scheme.

25.    Christopher Pettengill ("Pettengill") pleaded guilty on June 20, 2011 to crimes that he committed in connection with the Ponzi scheme. Pettengill was an owner and founder of Oxford Global Investments Inc. Pettengill was sentenced to 90 months in prison for his role in this Ponzi scheme.

26.    Jason Bo-Alan Beckman ("Beckman") was convicted on over 20 fraud and money-laundering counts for his role in the fraudulent scheme. Beckman was sentenced on January 3, 2013 and is serving a 30-year prison sentence. Beckman was the owner and founder of The Oxford Private Client Group, LLC, an investment advisory firm registered with the SEC. Beckman was a self-styled equities expert and spoke at a number of seminars touting his expertise, seminars that were organized by the Oxford and UBS Entities.

27.    Gerald Joseph Durand ("Durand") was convicted on 20 counts for his role in the Ponzi scheme and was also sentenced on January 3, 2013. Durand is serving a 20-year prison term. Similar to Kiley, Durand also had a radio show in furtherance of the Ponzi scheme. Durand was a major contributor to Ponzi scheme investment seminars and presentations.

28.    Defendant Associated Bank, N.A. offers banking and financial services throughout Wisconsin, Illinois, and Minnesota, and including the cities of Saint Louis

Park and Eagan, Minnesota. Associated Bank is a corporation organized existing under the laws of the State of Wisconsin, with its principal place of business and headquarters at 200 North Adams Street, Green Bay, Wisconsin 54301.

29.     Associated Bank's branch offices located in Saint Louis Park, Minnesota and Eagan, Minnesota are where the Ponzi scheme principals banked and had opened at least seven accounts as follows:

**KILEY ACCOUNTS**



**COOK ACCOUNTS**



14

## PETTENGILL ACCOUNT

30.     Crown Forex, SA was a currency-trading firm with operations in Basel, Switzerland. (Ex. 2) Crown Forex, SA's role in the Ponzi scheme was to pretend to be the firm that was to receive the investor funds, hold them in segregated accounts, and facilitate currency trades to generate the guaranteed returns. Crown Forex, SA was operated by Shadi Swais and others representing themselves as foreign exchange experts. Crown Forex, SA, was under investigation by Swiss authorities by December 2008. By May 2009, Swiss authorities had frozen all of Crown Forex, SA's assets, shut the operation down, and placed it into the Swiss equivalency of bankruptcy. Shadi Swais and others who controlled Crown Forex, SA have disappeared along with millions of dollars of investor funds.

31.     Not a single penny in investor funds was ever directly transferred from the Crown Forex LLC account #1705 to Crown Forex, SA for trading. Nor was a single penny in investor trading profits ever directly transferred from Crown Forex, SA to the Crown Forex LLC account #1705. Instead, despite the knowledge that account #1705 was holding investor funds for use in the Currency Program and was to be on Crown Forex, SA's books, Associated Bank assisted in the transfer of millions from account #1705 to Cook's own personal bank accounts along with other Receiver related

accounts—all of which would have been caught and stopped by a bank not acting in concert with a massive fraud. (*See* Ex. 12—Declaration of Scott J. Hlavacek, No. 09-cv-3333, Doc. 4, ¶ 35, Ex. 10 (D. Minn. Nov. 23, 2009) (tracing money flow in and out of account #1705).)

## FACTS GIVING RISE TO THIS CASE

32.     The Receiver incorporates paragraphs 1 through 31 above by reference.



34.     After Sarles joined Associated Bank in November 2007, his brother, Michael Behm, who was working for Kiley at the time, introduced Sarles to Kiley. Sarles subsequently met Cook and Pettengill through Kiley. (Ex. 4, ¶¶ 5, 8) Sometime before January 2008, Sarles personally met with Kiley at Kiley's place of business to discuss doing business with Associated Bank. (Ex. 4, ¶ 9) At that meeting Sarles learned much about Kiley.

16

35.     First, Vice President Sarles learned, if he already did not know it from his brother, that Kiley's place of business was not located in a business setting at all, but rather, it was located in a suburban home at 12644 Tiffany Court in Burnsville, Minnesota. (Ex. 1) Kiley's main office was nothing more than a converted bedroom with a desk and a few chairs. Vice President Sarles would have also learned that Kiley ran his radio program, which he used to pitch his investment services, out of the house and that his brother, Mike Behm, and others were in the basement working the phones to promote the Currency Program.





---

[2] 2007 Federal Financial Institutions Examination Council ("FFIEC") Bank Secrecy Act/Anti-Money Laundering ("BSA/AML") Examination Manual, at 45, available at http://www.ffiec.gov/bsa_aml_infobase/documents/BSA_AML_Man_2007.pdf (last accessed December 27, 2012).  *See also* 12 C.F.R. § 21.21.

[3] 2007 FFIEC BSA/AML Examination Manual, at 57.

[4] 2007 FFIEC BSA/AML Examination Manual, at 57, 255.





(Ex. 14)





46.     Once the Crown Forex LLC account #1705 was opened, the Ponzi scheme

principals used the Oxford and UBS Entities to solicit investors for the Currency Program

through telemarketing, radio broadcasts, investor seminars, personal meetings, word-of-mouth, and other means. (Christopher Pettengill Plea Agreement, ¶ 3(k).) Investors were fed false promises claiming that the Currency Program i) would generate an annual return of 10.5 to 12 percent; (ii) the Currency Program was a safe investment; (iii) the investor could not lose investment principal; and (iv) the investor could withdraw his or her investment assets at any time. (Christopher Pettengill Plea Agreement, ¶ 3(l).) The Currency Program was a continuation of the Ponzi scheme principals' efforts to defraud investors, which began by at least January 2007 and ultimately defrauded investors of over $190 million. (Ex. 1) As Cook and Pettengill's plea agreements establish, the financial services and investments being offered through the UBS and Oxford Entities were massive frauds that took in millions of dollars. (Exs. 1-2)





48.     The BSA/AML and its implementing regulations required Associated Bank

to monitor these transfers and deposit account transactions, among other things, to file

suspicious activity reports ("SAR") where suspicious activity is identified.[5] Monitoring

systems include manual systems, automated systems, and employee identification and

_____

[5] 31 U.S.C. §5318; 12 C.F.R. §21.21; 12 C.F.R §21.11.

23

referral systems.[6] Under the BSA/AML, the transfers above would have been flagged by Associated Bank's monitoring systems for suspicious activity. The transfers contain "red flags" of potentially suspicious activities for money laundering, terrorist financing or other financial crimes, such as transfers of large or round dollar amounts; transfer activity is repetitive or shows unusual patterns; and unusual transfers of funds occurring among related accounts or among accounts involving the same or related principals.[7] A bank employee would have reviewed all of these alerted transactions and made a determination whether or not to file a SAR as required under the BSA/AML. Despite these red flags, upon information and belief, Associated Bank ignored the above telltale signs and its legal duties to report suspicious activity, and thereby allowed the Ponzi scheme to continue.

49.     After the opening of the fictitious Crown Forex LLC account #1705, a string of variously named Oxford Global accounts were opened at Associated Bank: Oxford Global Investments Inc. account #1812 (Pettengill account), Oxford Global Partners LLC account #2356 (Cook account), and Oxford Global FX LLC account #2331 (Cook account). (Exs. 17-18) As to the Oxford Global FX LLC account #2356, Sarles understood that the account was to hold investor funds. (Ex. 4, ¶ 10) Yet, again, the purpose of the account was disguised by identifying it as a "Checking/Money Market"

---

[6] 2007 FFIEC BSA/AML Examination Manual, at 61.

[7] 2007 FFIEC BSA/AML Examination Manual at F-1 to F-3.

account. Moreover, no mention is made that the true purpose of the account was to hold

client funds for use in connection with Cook's alleged financial advisory services.













57.    By the first quarter of 2009 the Monitoring Department of Associated Bank was threatening to freeze the Crown Forex LLC account #1705 for lack of proper documentation. (Ex. 4, ¶¶ 18-19) These warnings were ignored and never acted upon since proper documentation was never obtained for Crown Forex LLC.











69.     On February 23, 2012, Associated Bank entered into a Consent Order for its failure to comply with the requirements of the BSA/AML with the Comptroller of the Currency of the United States of America. (Ex. 38) On information and belief, the compliance failures concerned the Ponzi scheme accounts at issue in this Complaint.

### COUNT I
### AIDING AND ABETTING FRAUD

70.     The Receiver incorporates paragraphs 1 through 69 above by reference.

**Ponzi Scheme: The Underlying Fraud**

71.     The Ponzi scheme orchestrated by the Ponzi scheme principals has damaged the Oxford and UBS Entities as a matter of law. Proof of such are the prior proceedings in which Cook pled guilty to fraud, Pettengill pled guilty to fraud, Kiley, Beckman and Durand were found guilty of fraud, and related court opinions clearly articulating that the Oxford and UBS Entities and their creditors have been harmed by the fraud.

**Associated Bank Had Actual Knowledge of the Fraud**











**Associated Bank Provided Substantial Assistance to Cook & Kiley**







81.     Associated Bank, by allowing Cook, Kiley and others to maintain fictitious accounts and transfer millions to and from the accounts, perpetuated their ability to continue and expand the Ponzi scheme.

82.     Associated Bank's acts and omissions lacked business justification. Taken together, the facts of this case support a finding that, with profits in mind, Associated Bank aided and abetted the Ponzi scheme.

83.     By virtue of Associated Bank's actions the Oxford and UBS Entities have sustained substantial injury as a result of the monies they now owe the defrauded creditors that forwarded funds to the fictitious accounts. Associated Bank is therefore liable for all damages actually and proximately caused to the Oxford or UBS Entities.

WHEREFORE, the Receiver demands judgment against Associated Bank for (i)

41

actual compensatory, consequential, incidental, special and exemplary punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post-judgment interest as allowed by law; and (iv) such other and further legal and equitable relief as the Court deems just and proper.

## <u>COUNT II</u>
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

84.     The Receiver incorporates paragraphs 1 through 83 above by reference.

85.     At all material times, Cook, Kiley and Pettengill were officers, members, and/or directors of the Oxford and/or UBS Entities and as such owed them a fiduciary duty to discharge their duties in good faith, with the care that an ordinarily prudent officer, member or director in a like position would exercise and in a manner reasonably believed to be in the best financial interests of the Oxford and UBS Entities.

86.     Cook, Kiley and Pettengill breached the fiduciary duty owed to the Oxford and UBS Entities by using the Oxford or UBS Entities to induce investors to invest in the Currency Program, and subsequently used the investor funds to fuel the Ponzi scheme and to line their own pockets. Cook, Kiley and Pettengill exhibited a willful, fraudulent, reckless and/or negligent disregard for the best financial interest of the Oxford and UBS Entities with no legitimate or justifiable business purpose.





88.     By virtue of Associated Bank's actions the Oxford and UBS Entities have sustained substantial injury as a result of the monies they now owe the defrauded investors. Associated Bank is therefore liable for all damages actually and proximately caused to the Oxford and UBS Entities.

WHEREFORE, the Receiver demands judgment against Associated Bank for (i) actual compensatory, consequential, incidental, special and exemplary punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post judgment interest as allowed by law; and (iv) such other and further legal and equitable relief as the Court deems just and proper.

## COUNT III
## AIDING AND ABETTING CONVERSION

89.     The Receiver incorporates paragraphs 1 through 88 above by reference.

90.     This is claim seeking damages on the grounds of aiding and abetting Cook and Kiley's conversion of the funds entrusted to the Oxford or UBS Entities for investment purposes.

91.     Cook and Kiley willfully interfered with the personal property of the Oxford or UBS Entities, without justification and inconsistent with the rights of those entities which were solely entitled to the use, possession, or ownership of the funds.

92.     Cook and Kiley wrongfully asserted dominion and control over millions of dollars of investment funds entrusted to the Oxford or UBS Entities and converted those funds for purposes other than the intended use, such as the purchase of property in Panama, interests in foreign financial entities, and various other unauthorized transfers to third parties.





94.     By virtue of Associated Bank's actions, the Oxford and UBS Entities have sustained substantial injury as a result of the monies they now owe third party creditors. Associated Bank is therefore liable for all damages actually and proximately caused to the Oxford or UBS Entities.

WHEREFORE, the Receiver demands judgment against Associated Bank for (i) actual compensatory, consequential, incidental, special and exemplary punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post-judgment interest as allowed by law; and (iv) such other and further legal and equitable relief as the Court deems just and proper.

## COUNT IV
### AIDING AND ABETTING FALSE REPRESENTATIONS AND OMISSIONS

95.     The Receiver incorporates paragraphs 1 through 94 above by reference.



45



98.     By virtue of Associated Bank's actions and omissions, the Oxford and UBS Entities have sustained substantial injury as a result of the monies they now owe the defrauded creditors as a result of their false statements and omissions. Associated Bank is therefore liable for all damages actually and proximately caused to the Oxford or UBS Entities.

WHEREFORE, the Receiver demands judgment against Associated Bank for (i) actual compensatory, consequential, incidental, special and exemplary punitive damages in an amount to be proven at trial; (ii) such civil penalties as allowed by law; (iii) pre-judgment and post-judgment interest as allowed by law; and (iv) such other and further legal and equitable relief as the Court deems just and proper.

46

## <u>DEMAND FOR A JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial as to all issues so triable.

Dated:  January 29, 2013                    Respectfully submitted,

CARLSON, CASPERS, VANDENBURGH,
LINDQUIST & SCHUMAN, P.A.

*s/ R.J. Zayed*
R.J. Zayed (MN Bar No. 309,849)
Tara C. Norgard (MN Bar No. 307,683)
Brian W. Hayes (MN Bar No. 294,585)
Russell J. Rigby (MN Bar No. 323,652)
Brenton A. Elswick (MN Bar No. 388,816)
Carlson, Caspers, Vandenburgh, Lindquist
    & Schuman, P.A.
225 S. 6th Street, Suite 4200
Minneapolis, MN  55402
Telephone: (612) 436-9600
Facsimile: (612) 436-9605
Email: rzayed@carlsoncaspers.com


SPECIAL LITIGATION COUNSEL TO THE RECEIVER:


Keith A. Vogt (*pro hac vice* pending)
Stadheim & Grear Ltd.
400 N. Michigan Avenue, Suite 2200
Chicago, IL  60611
Telephone: (312) 755-4400
Email: vogt@stadheimgrear.com