UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 13-232(DSD/SER)

R.J. Zayed, In His Capacity as
Court-Appointed Receiver for the
Oxford Global Partners, LLC,
Universal Brokerage, FX, and
Other Receiver Entities,

        Plaintiff,

v.                                                        **ORDER**

Associated Bank, N.A.,

        Defendant.

William W. Flachsbart, Esq. and Flachsbart & Greenspoon, 333 N. Michigan Ave., Suite 2700, Chicago, IL 60601; D. Timothy McVey, Esq. and McVey & Parsky LLC, 30 N. LaSalle, Suite 2100, Chicago, IL 60602; Keith A. Vogt, Esq. and Takiguchi & Vogt, LLP, 1415 West 22nd Street, Tower Floor, Oak Brook, IL 60523 and Brian W. Hayes, Esq., Tara C. Norgard, Esq. and Carlson Caspers Vandenburgh Lindquist & Schuman PA, 225 South 6th Street, Suite 4200, Minneapolis, MN 55402, counsel for plaintiff.

Charles F. Webber, Esq and Faegre Baker Daniels LLP, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402 and Stephen M. Medlock, Esq. and Mayer Brown, LLP, 1999 K Street, NW, Washington, DC 20006, counsel for defendant.

This matter is before the court upon the motions to exclude expert testimony by Receiver R.J. Zayed and the motions for summary judgment, sanctions, and to exclude expert testimony by defendant Associated Bank. Based on a review of the file, record, and proceedings herein, and for the following reasons, the court grants the motion for summary judgment and denies the remaining motions as moot.

**BACKGROUND**

The background of this matter is fully set forth in the court's September 30, 2013, and August 4, 2015, orders, and the court recites only those facts necessary to resolve the instant motions. See ECF Nos. 50, 78. This receivership action arises out of a criminal Ponzi scheme committed using Associated Bank accounts. The scheme principals included, among others, Trevor Cook, Patrick Kiley, and Chris Pettengill.[1] Compl. ¶ 1, ECF No. 42. The scheme purported to guarantee investors a return in excess of 10% annually through foreign currency trading with Crown Forex, S.A., a Swiss company. Id. ¶ 3. In furtherance of the scheme, the Receivership Entities opened accounts with multiple financial institutions, including Associated Bank. The Receiver alleges that Lien Sarles, a former vice president of Associated Bank, had knowledge of and assisted in the fraud.

The banking relationship between Sarles and the scheme principals began in December 2007 or January 2008. Sarles Decl. ¶ 8. Kiley was referred to Sarles by Michael Behm, Sarles's step-brother, for commercial banking services. Id. During the course of the banking relationship, Sarles occasionally socialized with

---

[1]    Cook and Kiley used several corporate entities to perpetuate the scheme. These entities include Oxford Global Partners, LLC; Oxford Global FX, LLC; Oxford FX Growth, L.P.; Universal Brokerage FX Management, LLC; Market Shot, LLC; and other entities controlled by them. See Compl. ¶ 2. The court will refer to the entities as "Receivership Entities."

2

Cook.  Sarles Dep. at 64:16-20; 174:10-175:2.  During a meeting with Cook, Pettengill, and others, Cook quoted lines, such as "greed is good," from the movies <u>Wall Street</u> and <u>Boiler Room</u>, but there is no evidence that Sarles understood that these comments referred to the ongoing Ponzi scheme.  <u>See</u> Pettengill Dep. at 124:21-125:20.

In 2008, Sarles personally assisted Kiley in opening several commercial accounts, including account #1705 registered to Crown Forex LLC, the domestic counterpart to Crown Forex, S.A.  Sarles Decl. ¶ 9; <u>see</u> Greenspoon Decl. Ex. 21, ECF No. 235.  Kiley and Julia Smith were signatories on the account.  <u>See</u> Greenpoon Decl. Ex. 21.  The Receiver alleges that the Crown Forex account was integral to the Ponzi scheme.  Specifically, investors would deposit money into the account, which was then transferred to other Associated Bank accounts and accounts at other institutions for personal use by the scheme principals.  Compl. ¶ 33.

Sarles opened the Crown Forex account, despite lacking the necessary Secretary of State registration documents.  Sarles Decl. ¶ 14.  Sarles testified that he opened the account with the understanding that Kiley would provide the documents later.  <u>Id.</u>; Sarles Dep. at 109:6-16.[2]  Sarles, however, did not follow up to obtain the necessary documentation.  He was later informed that the

---

[2]  The parties do not dispute that Cook and Kiley provided the necessary registration documents for their other accounts at the Bank.  Sarles Decl. ¶¶ 13-14.

Bank would close or freeze the Crown Forex account for lack of proper documentation, but that never occurred. Sarles Decl. ¶¶ 17, 19.

Sarles understood that the Crown Forex account was an investment account, but the account opening forms indicate that it was a "Checking/Money Market" account.[3] <u>See id.</u> ¶ 14; Sarles Dep. at 120:1–121:21; Greenspoon Decl. Ex. 21. Although the Crown Forex account was set up to wire investment money to the foreign Crown Forex entity for investment purposes, no international transfers appear to have occurred. <u>See</u> Sarles Dep. at 120:24–121:21; Greenspoon Decl. Ex. 22 at 34830; <u>Id.</u> Ex. 32. Sarles also assisted Cook in opening several other accounts on which Cook was the signatory, including account #2331, whichwas registered to Oxford Global FX, LLC. Sarles Decl. ¶ 10; Greenspoon Decl. Ex. 25 at 56568.

On April 19, 2013, the Receiver filed this action, alleging claims for aiding and abetting fraud, aiding and abetting breach of fiduciary duty, aiding and abetting conversion, and aiding and abetting false representations and omission against Associated Bank based on Sarles's relationship with Cook and the other scheme principals. Associated Bank now moves for summary judgment.

---

[3] Natalya Epsey completed the accounting opening forms. <u>See</u> Greenspoon Decl. Ex. 21. There is no evidence that Sarles instructed Epsey to label the account as a "checking/money market" account rather than an investment account, nor does the Receiver allege that Epsey has actual knowledge of the Ponzi scheme.

## DISCUSSION

### I.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient ....").

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. Id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

## II.  Aiding and Abetting Claims

To state a claim for aiding and abetting under Minnesota law, a plaintiff must show that (1) a primary actor committed a tort that caused injury to the plaintiff, (2) the aider and abettor knew that the primary actor's conduct constituted a tort, and (3) the aider and abettor substantially assisted or encouraged the primary actor in committing the tort.  Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999); see also In re Temporoamandibular Joint (TMJ) Implants Prods. Liab. Litig., 113 F.3d 1484, 1495 (8th Cir. 1997) (same).  The elements of knowledge and substantial assistance are analyzed in tandem.  Witzman, 601 N.W.2d at 188. "Where there is a minimal showing of substantial assistance, a greater showing of [knowledge] is required."  Id.  (citation and internal quotation marks omitted).

In determining whether the requisite showing of knowledge and assistance exists the court will consider "[f]actors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind."  Id.

### A.  Law of the Case

The Receiver argues that the facts as recited by the Eighth Circuit Court of Appeals in its previous opinion in this matter preclude summary judgment.  See Zayed v. Associated Bank, 779 F.3d

6

727 (8th Cir. 2013).  The law is clear, however, that a court is
not bound by the facts recited by an appellate decision at the
pleading stage when deciding a summary judgment motion.  Burton v.
Richmond, 370 F.3d 723, 728 (8th Cir. 2004).  Therefore, the Eighth
Circuit's previous decision does not preclude summary judgment.

### B.  Knowledge

"An aider and abettor's knowledge of the wrongful purpose is
a crucial element in aiding or abetting cases."  E-Shops Corp. v.
U.S. Bank Nat'l Ass'n, 678 F.3d 659, 663 (8th Cir. 2012) (citation
and internal quotation marks omitted).  "[W]here the conduct is not
a facial breach of duty, courts have been reluctant to impose
liability on an alleged aider and abettor for anything less than
actual knowledge that the primary tortfeasor's conduct was
wrongful."  Witzman, 601 N.W.2d at 188.  In other words, "[w]hile
knowledge may be shown by circumstantial evidence, courts stress
that the requirement is *actual* knowledge and the circumstantial
evidence must demonstrate that the aider-and-abettor *actually knew*
of the underlying wrongs committed."  Varga v. U.S. Bank Nat'l
Ass'n, No. 12-3180, 2013 WL 3338750, at *6 (D. Minn. July 2, 2013)
(emphasis in original) (citations and internal quotation marks
omitted); see also El Camino Res. Ltd. v. Huntington Nat'l Bank,
712 F.3d 917, 922-23 (6th Cir. 2013) (requiring, under the
Restatement definition of aiding and abetting, that bank must have

more than "strong suspicion of wrongdoing").[4]

The Receiver, citing Witzman, argues that constructive knowledge, rather than actual knowledge, may also suffice. See Witzman, 601 N.W.2d at 188 ("In cases where the primary tortfeasor's conduct is clearly tortious or illegal, some courts have held that a defendant with a long-term or in-depth relationship with that tortfeasor may be deemed to have constructive knowledge that the conduct was indeed tortious."). But the Witzman court only noted in dicta, citing a Second Circuit case, that some courts hold that constructive knowledge can be sufficient in certain circumstances. Even if Minnesota courts would apply a standard of constructive knowledge, it does not apply here because the scheme was not clearly tortious or illegal to those not directly involved; indeed, the scheme involved multiple individuals, business entities, and banks, was furthered by ostensibly legitimate transactions, and went undiscovered for three years. See id. ("[Defendant] may have reasonably believed that these allegedly tortious dealings were legitimate ....").  Further, the two-year banking relationship between the scheme principals and the Bank, including Sarles, cannot be characterized as a long-term or in-depth relationship. See id. (applying an actual knowledge standard where defendant had served as torfeasor's accountants for

---

[4]  Minnesota has adopted the Restatement definition of aiding and abetting.  Witzman, 601 N.W.2d at 187.

over three decades).   Therefore, in order to be found liable, the Bank must have actually known of the Ponzi scheme.[5]

The Receiver argues that the Bank, via Sarles, actually knew about the Ponzi scheme because Sarles (1) had a close relationship with Cook; (2) employed strategies to avoid detection when opening the scheme principals' accounts; (3) deflected internal investigations into the accounts; (4) attended meetings in furtherance of the scheme; (5) wrongfully approved fund withdrawals for non-signatories; and (6) tricked individuals into signing blank forms.   The Receiver also argues that the Bank, apart from Sarles's knowledge, had actual knowledge because it failed to investigate suspicious activity and failed to follow through on investigations already in progress.   As discussed below, these allegations are either unsupported or contradicted by the record, and no reasonable jury could infer that Sarles or anyone else at the Bank had actual knowledge of the Ponzi scheme.

---

[5]   The Receiver urges the court to frame the aiding and abetting analysis in terms of each individual tort alleged in the complaint, that is, to ask whether the Bank knew about and substantially assisted conversion, breach of fiduciary duty, fraud, and negligent misrepresentation rather than the Ponzi scheme generally.   But this is a distinction without a difference. Although the court refers to the complaint in determining whether there is a genuine issue of material fact, each of the counts in the complaint relies exclusively on the conduct underlying the Ponzi scheme.   Therefore, there must be evidence indicating knowledge and substantial assistance of the Ponzi scheme in order for the individual counts to survive summary judgment.

### 1.   Close Relationship with Cook

The Receiver points to Sarles's "deep, close, long-term relationship with Cook" as evidence of his actual knowledge of the scheme.  Pls.' Mem. Opp'n at 5.  But this characterization is a stretch - the record demonstrates nothing more than a normal client relationship that included occasional socializing.  <u>See</u> Sarles Dep. at 64:16-20; 174:10-175:2.

The Receiver contends that, as further evidence of the close relationship, Sarles deleted a portion of an email conversation with Cook to mask Cook's gambling habits.  <u>See</u> Greenspoon Ex. 12. But a review of the full email, which the Receiver fails to cite, shows that the deleted text was a request from Cook for the balances of two accounts and Sarles's reply in which he asked Cook to recommend casinos to visit in Panama.  <u>See</u> Ex. 12, ECF No. 244-16.[6]  Read as a whole, the email is innocuous, and does not establish an unusually close bond between Cook and Sarles.

### 2.   Detection-Avoidance Strategies

The Receiver argues that Sarles must have had actual knowledge of the scheme because he engaged in detection-avoidance strategies when opening the Crown Forex LLC account.  The Receiver points to the fact that Sarles opened the account without the proper Secretary of State documentation.  Although Sarles admits that he

---

[6]  The Bank did not attach their exhibits to a declaration, so the court will refer to its exhibits by ECF number.

failed to obtain the required documentation, it does not necessarily follow that he was trying to avoid scrutiny by doing so. Nothing in the record contradicts Sarles's testimony that he relied on Kiley's representation that he would provide the Secretary of State registration documents at a later time. Further, Sarles's reliance on Kiley's statement was reasonable given that proper documentation had been provided for the other accounts.

The Receiver next alleges that Sarles falsified the account opening documents by indicating that the account was a money market or checking account rather than an investment account. But Epsey, not Sarles, completed the account opening documents, and she did so by selecting what she thought was the best match from a pre-populated list of options. Epsey Dep. at 152:18-153:4. The Receiver does not allege that Epsey had any knowledge of the Ponzi scheme, nor is there evidence that Sarles directed Epsey to fill out the form in a certain way.

The Receiver also argues that Sarles attempted to avoid scrutiny by opening the account in the name of Crown Forex LLC, a domestic entity, rather than Crown Forex, S.A., a foreign entity. But the Receiver does not dispute that Sarles was following bank policy by opening the account in the name of a domestic entity. Sarles Dep. at 69:6-13; 71:8-11. Morever, the Receiver does not explain how opening the account in the name of a domestic entity

subjected the account to less scrutiny.   Indeed, based on the inquiries discussed below, it appears that the Bank did in fact scrutinize the account.

Finally, the Receiver cites to the fact that Sarles, in violation of bank policy, overrode identification check failures when opening accounts for Crown Forex and Cook's other business entities.   See Greenspoon Decl. Ex. 25 at 59570-75.   It is undisputed, however, that such overrides were common at the bank, despite bank policy to the contrary.   See Kitowsky Dep. at 121:11-122:9.   At most, these facts indicate negligence on the part of the Bank in maintaining adequate policies and procedures.[7]

### 3.   Deflecting Internal Investigations

The Receiver also contends that Sarles deflected the internal investigation of Crown Forex's wire activity and address, thereby establishing his actual knowledge of the fraud.[8]   The Bank's BSA/AML compliance department requested more information about Crown Forex's business because of "a lot of wire activity on the account."[9]   Greenspoon Decl. Ex. 22 at 34832.   Sarles replied that

---

[7]   The Comptroller of the Currency entered a monetary civil penalty of $500,000 against the Bank for an inadequate Bank Secrecy Act and Anti-Money Laundering program.   See Ex. 15, ECF No. 244-19.

[8]   Although the Receiver uses the term "internal investigation," the record shows that the instances cited were emails requesting clarification or additional information.

[9]   The BSA/AML department is responsible for ensuring compliance with the Bank Secrecy Act and money laundering statutes.

Crown Forex "manages a global fund" and "[w]e knew there would be a lot of wire activity from the start." Id. at 34830. There is no evidence that the compliance department was unsatisfied with Sarles's response. The Receiver argues that Sarles's statement was untrue because he testified that he never discussed the level of expected wire activity with any of the scheme principles. See Sarles Dep. at 94:15-96:22. But Sarles also testified that he looked to previous accounts opened by the scheme principals to gauge how much wire activity expect and noted frequent wire activity. Id. at 124:4-18. Thus, Sarles's response to the compliance department was neither false nor a deflection.

The Receiver also alleges that Sarles lied to deflect an inquiry into Crown Forex's address. Crown Forex's listed address was 5413 Nicollet Avenue, but another bank discovered that this address was incorrect and notified the Bank of the discrepancy. See Greenspoon Decl. Ex. 21; id. Ex. 23. Ryan Rasske, the Bank's Director of Risk and Financial Crime, forwarded the inquiry to Joanne Alberts who contacted Sarles. See Greenspoon Decl. Ex. 23. Sarles informed Alberts that the Nicollet address was an old address and that Crown Forex had moved to 1900 La Salle Avenue. See id. Although the Receiver argues that Sarles lied in his response, there is no evidence that Sarles knew the address to be false or even that it was false when Cook submitted the account opening forms. See id. Ex. 21. Further, there is no evidence that

Sarles had a duty to independently verify Crown Forex's address. Sarles Dep. at 112:14-113:17.

Finally, the Receiver cites to an email from Rasske asking Sarles questions about Kiley's and Julia Smith's relationship to the Crown Forex account. <u>See</u> Greenspoon Decl. Ex. 24. But the record does not reflect whether Sarles responded to Rasske's questions or whether Rasske continued to pursue the inquiry. Under these circumstances, it is not reasonable to infer that Sarles attempted to deflect "investigations" into Crown Forex.

### 4. Meetings in Furtherance of the Scheme

The Receiver alleges that Sarles attended meetings in furtherance of the scheme, but the record again fails to support this assertion. Although Sarles attended meetings with the scheme principals, during which they engaged in banter about financial industry greed, there is no evidence that Sarles understood them to be disclosing or discussing the Ponzi scheme.

The Receiver also points to Sarles's attendance at an investment seminar organized by the scheme principals as evidence that he assisted in the scheme's recruiting efforts. The record shows, however, that Sarles merely observed the seminar. Pettengill Dep. at 224:9-226:17.

Lastly, the Receiver cites Sarles's attendance at a meeting in April or May of 2008 where Cook, Kiley, and others allegedly discussed propping up bankrupt Crown Forex, S.A. by illegally re-

papering accounts.   Pettengill's testimony is the only evidence
that this alleged meeting occurred.   See Pettengill Dep. at 172:10-
176:6.   Even assuming it occurred, the testimony does not support
the Receiver's characterization of the meeting.

Pettengill testified that at the meeting Cook discussed
segregating client accounts per the recommendation of Cook's
lawyers.   Id. at 180:15-181-25.   The meeting participants did not
discuss the fact that Cook's illegal strategy to re-paper the
account was different than the strategy proposed by Cook's lawyers.
Id. at 183:5-184:10.   Pettengill testified that the illegality of
the strategy was implied.   Id.   The court has carefully reviewed
and considered in full Pettengill's testimony, and it does not
believe that a jury could reasonably infer that Sarles actually
knew about the Ponzi scheme based on the alleged meeting.[10]   At
most, Pettengill's testimony supports a weak inference that Sarles
should have inquired further into the Crown Forex account.   But to
further infer, based upon that weak inference, that Sarles had
actual knowledge is a step too far.   See ACT Inc. v. Sylvan
Learning Sys., 296 F.3d 657, 667 (8th Cir. 2002) ("But the supposed
evidence to which [plaintiff] points requires us to draw inference

---

[10]   The Bank has moved for an adverse inference that the 2008
meeting did not occur because the Receiver should be held
responsible for Cook and Kiley's alleged destruction of evidence
relating to the meeting.   Because the court fully considered
Pettengill's testimony and concluded that it does not create a
genuine issue of material fact, the motion will be denied as moot.

upon inference in order to conclude there might be a material fact issue lurking somewhere.  We decline to do so ....").

### 5.  Wrongful Fund Withdrawals

The Receiver next argues that Sarles must have known about the scheme because he authorized transfers from the Crown Forex account to Cook's Oxford Global account without proper authorization from a Crown Forex signatory.  Although transaction receipts show that Sarles approved three transfers from the Crown Forex account to other accounts, they do not show that those transfers were requested by non-signatories.  See Greenspoon Ex. 27.  Indeed, Julia Smith, a signatory on the Crown Forex account, requested at least two of the transfers.[11]  See id.; Medlock Decl. Ex. 1, ECF No. 259.

The Receiver also claims that Sarles authorized Cook, who was not a signatory on the Crown Forex account, to transfer $600,000 from that account to his own account.  Again, this claim is contradicted by the record; the $600,000 transfer was from the Oxford Global account on which Cook was a signatory, not the Crown Forex account.  See Greenspoon Decl. Ex. 28 at 51593.[12]  As a

_____

[11]  The record does not indicate who requested the third transfer.

[12]  The email references a previous transfer from the Crown Forex account to the Oxford Global account, but only to confirm that the previous transfer was complete and that the funds were available for withdrawal from the Oxford Global account.  See id. at 51591.  There is no evidence that the transfer from the Crown Forex account was requested by an unauthorized person.

result, there is simply no evidence that Sarles wrongfully authorized transfers from the Crown Forex account.

### 6.   Dishonestly Obtaining Signatures

The Receiver also argues that Sarles had actual knowledge of the scheme because he tricked Leo Domenichetti, who worked for the scheme principals, into signing blank forms.   Contrary to Receiver's assertion, he did not testify that the forms were blank. See Domenichetti Dep. at 150:13-155:14; 179:2-181:25.   Instead, Domenichetti testified that he could not remember whether certain areas of the form he signed were blank or completed.   See id.

Viewing all the evidence in the light most favorable to the receiver, the evidence, at most, shows that Sarles occasionally socialized with Cook, that he failed to obtain the necessary documentation in opening one account, and that he may have failed to answer one internal inquiry.   This evidence, viewed in context, does not support a finding that Sarles actually knew about the fraudulent scheme, nor is it sufficient to create a genuine issue of material fact.   See Frieze v. Boatmen's Bank of Belton, 950 F.2d 538, 541 (8th Cir. 1991) ("Although [the nonmoving party] is entitled to the benefit of all reasonable inferences, an inference is reasonable only if it can be drawn from the evidence without resort to speculation.").

### 7.   Other Associated Bank Employee's Knowledge

The Receiver argues that, even if Sarles did not know about

the fraud, other employees at the Bank did.   Yet, other than
Rasske, the Receiver does not identify any other employees and
merely relies on the same arguments rejected above.   The Receiver
also cites to the Bank's failure to follow up on unusual aspects of
the Crown Forex account.   For example, the bank failed to
investigate Crown Forex's move from Nicollet Avenue to La Salle
Avenue or the fact that, although characterized as a global fund,
all of the wire transfers were to domestic entities.   But these
facts, at the very most, only support a weak inference that the
Bank may have been negligent in maintaining adequate policies,
which is insufficient to give rise to aiding and abetting
liability.   See Camp v. Dema, 948 F.2d 455, 459 (8th Cir. 1991)
(citation and internal quotation marks omitted) ("[A] bare
inference that the defendant must have had knowledge of the primary
violation is insufficient."); K&S P'ship v. Cont'l Bank, N.A., 952
F.2d 971, 979 (8th Cir. 1991) (holding that negligence in
adequately supervising a risky lending policy was not sufficient
for aiding and abetting liability).   Further, it appears that the
Bank failed to adequately monitor clients generally, see Ex. 15,
ECF No. 244-19, rather than only those accounts used in the fraud.
See Am. Bank of St. Paul v. TD Bank, N.A., No. 09-2240, 2011 WL
1810643, at *8 (D. Minn. May 9, 2011) (inferring actual knowledge
where the bank violated its internal policies with respect to the
tortfeasor).   As a result, there is no genuine issue of material

18

fact as to the Bank's actual knowledge.

## C.    Substantial Assistance

Even if there were some evidence of actual knowledge, there is
no evidence that the Bank substantially assisted the fraud.   To
demonstrate substantial assistance, a plaintiff must "show that the
secondary party proximately caused the violation, or, in other
words, that the encouragement or assistance was a substantial
factor in causing the tort."   K&S P'ship, 952 F.2d at 979.   "Some
affirmative step is required, because the mere presence of the
particular defendant at the commission of the wrong, or his failure
to object to it, is not enough to charge him with responsibility."
Am. Bank of St. Paul, 713 F.3d at 462 (citation and internal
quotation marks omitted) (applying Minnesota law).   In other words,
"[l]iability is based on [defendant's] affirmative acts, not acts
it should have taken."   Id. at 463.

"To determine what constitutes substantial assistance, courts
generally consider ... the nature of the act encouraged, the amount
of assistance given, the aider-and-abettor's presence or absence at
the time of the tort, its relation to the primary actor, and its
state of mind.   Varga, 2013 WL 3338750, at *7.   Moreover, "the
conduct in question must be undertaken with some degree of
knowledge (1) of its wrongful purpose and (2) that it is aiding the
tortfeasor."   Id. (citing Camp, 948 F.2d at 460).

19

The Receiver argues that the Bank substantially assisted the Ponzi scheme through money transfers by non-signatories, detection-avoidance strategies, and improperly labeling the Crown Forex account as a "checking/money market" account. As discussed above, there is no evidence that non-signatories withdrew funds from the Crown Forex account. And to the extent that Sarles failed to follow proper procedures in opening the Crown Forex account, there is no indication he did so in furtherance of the scheme. Indeed, as evidenced by the threat of account closure, Sarles's failure to obtain the necessary Secretary of State documentation actually made exposure of the scheme more likely. Such circumstances do not amount to substantial assistance. See Mendelsohn v. Capital Underwriters, Inc., 490 F. Supp. 1069, 1084 (N.D. Cal. 1979) (holding that there was no substantial assistance where accounting services made exposure more likely). The Receiver also contends that a set of fourteen cashier's checks issued by the bank with incorrect remitter lines created the impression that the checks were issued from segregated accounts, thereby creating an illusion of legitimacy. But the Receiver concedes that Tammy Sotebeer, who drafted the checks, did not know about the scheme and nothing in the record indicates that she acted with a wrongful purpose or at the direction of those involved in the scheme. See Ex. 13 at Interrog. 1, ECF No. 244-17; Ex. 14 at Req. 46, ECF No. 244-18. Therefore, there is no evidence that these checks were issued with

a wrongful purpose or that substantially furthered the scheme.

Finally, the Receiver relies on the Bank's failures to conduct adequate risk assessments, conduct customer due diligence, and implement adequate suspicious activity monitoring. But these failures only show what the Bank should have done. As discussed above, the scheme must be furthered by affirmative acts, not mere omissions. Even if omissions are sufficient, the Receiver fails to show how they substantially assisted the fraud. Therefore, there is no genuine issue of material fact concerning the Bank's lack of substantial assistance to the scheme, and, as a result, summary judgment is warranted.[13]

CONCLUSION

Accordingly, based on the above, **IT IS HEREBY ORDERED** that:

1. Defendant's motion for summary judgment [ECF No. 177] is granted;

2. Defendant's motion for sanctions or an adverse inference [ECF No. 175] is denied as moot;

3. Defendant's motion to exclude expert testimony [ECF No. 173] is denied as moot;

4. Plaintiff's motions to exclude expert testimony [ECF Nos. 179, 181] are denied as moot; and

---

[13] Because the court grants the motion for summary judgment, it denies the motions for exclusion of expert testimony as moot.

21

    5.  The case is dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: January 31, 2017

                                        s/David S. Doty
                                        David S. Doty, Judge
                                        United States District Court